IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| AKHEN A. MIZRAIM, | ) | CIVIL NO. 11-00077 JMS/KSC |
| | ) | |
| Plaintiff, | ) | ORDER GRANTING IN PART |
| | ) | AND DENYING IN PART |
| vs. | ) | DEFENDANT NCL AMERICA |
| | ) | LLC'S MOTION FOR SUMMARY |
| NCL AMERICA, INC., NCL | ) | JUDGMENT |
| AMERICA, NCL AMERICA LLC, | ) | |
| JOHN DOES 1-5, JANE DOES 1-5, | ) | |
| DOE CORPORATIONS 1-5, DOE | ) | |
| LLCS 1-5, DOE PARTNERSHIPS 1-5, | ) | |
| DOE NON-PROFIT | ) | |
| ORGANIZATIONS 1-5, AND DOE | ) | |
| GOVERNMENTAL AGENCIES 1-5, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT NCL AMERICA LLC'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

On November 18, 2010, Plaintiff Akhen A. Mizraim ("Plaintiff") filed

this action in the First Circuit Court of the State of Hawaii alleging that Defendant

NCL America LLC ("Defendant") discriminated against him on the basis of race,

exposed him to a hostile work environment, and retaliated against him in violation

of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et

seq., Hawaii's anti-discrimination statute, Hawaii Revised Statutes ("HRS") § 378-

2, and the Hawaii Whistleblower's Protection Act (the "HWPA"), HRS § 378-61.

Defendant subsequently removed the action to this court.

Currently before the court is Defendant's Motion for Summary

Judgment, arguing that Plaintiff has failed to establish a genuine issue of material

fact in support of any of his claims.  Based on the following, the court GRANTS in

part and DENIES in part Defendant's Motion for Summary Judgment.

## II. BACKGROUND

### A.    Factual Background

On April 10, 2006, Defendant hired Plaintiff to work on a cruise ship

as a Utility Galley, and promoted him to Galley Steward on August 13, 2006.  Doc.

No. 54, Def.'s Concise Statement of Facts ("CSF") ¶ 1.[1]  Plaintiff's job duties

generally involved keeping the dishwashing machine clean, cleaning dishes, pots,

and pans, cleaning the kitchen floors and walls, and taking the garbage out of the

kitchen.  Doc. No. 63-2, Pl.'s Decl. ¶ 2.  During his employment with Defendant,

Plaintiff asserts that he was discriminated against due to his race (African

American), retaliated against for reporting discrimination, and was subjected to a

hostile work environment.  The following events make up the basis of these claims:

---

[1]  Where the parties do not dispute a particular fact, the court cites directly to Defendant's
CSF.

### 1.    *Number of Overtime Hours Assigned to Work*

In 2008, Sanitation Supervisor Ronald Strode, who is responsible for scheduling sanitation department employees' work hours, received directions from Assistant Food and Beverage Director Jay Shaughnessy to reduce the number of overtime hours that crewmembers worked.  *See* Doc. No. 54-2, Ronald Strode Decl. ¶¶ 1-5.  Strode asserts that he implemented this directive by reducing every crewmember's hours by a similar amount, and further denies that he reduced the overtime hours of African American employees more than those of other workers. *See id*. ¶¶ 6-7.  Indeed, Plaintiff had the highest number of overtime hours for the September 2008 pay period.  *Id.* ¶¶ 8-9, Doc. No. 54-13, Def.'s Ex. G; *see also* Doc. No. 54, Def.'s CSF ¶ 3.

Plaintiff acknowledges that crewmembers' hours were "reduced across the board," *see* Doc. No. 54-7, Def.'s Ex. A. at 167, and that he did not review the records of hours for other workers.  Doc. No. 54, Def.'s CSF ¶ 3.  Yet Plaintiff nonetheless asserts that he was sent home while Filipino employees were allowed to stay at work and accrue more hours:

> Q.    Have you ever reviewed the records of hours for all of the galley stewards?
> A.    No.  I look at the time sheets, and I know that when it comes time, they say, well, you go home.

> And they asked the Philippines to stay.  They say,
> oh, yeah, they have to finish up to clean and this
> and that.  And they sent us home, me and the other
> guy home.

*See* Doc. No. 54-7, Def.'s Ex. A at 166.

In September 2008, Plaintiff complained to Strode that he and other African American workers were getting their hours reduced while Filipino and Caucasian workers were receiving more hours.  Doc. No. 63-2, Pl.'s Decl. ¶ 4.  On October 11, 2008, Plaintiff and another African American employee, Daniel Ikegwu, reiterated similar complaints in a joint written statement to Lynn Rolland, the Human Resources Manager.  *Id.* ¶ 5.

### 2.   *The October 2008 Stabbing Incident*

On October 30, 2008, Plaintiff reported an October 20, 2008 incident in which a fellow employee, David Rodak, allegedly stabbed him in his right leg.[2] *See* Doc. No. 54-8, Def.'s Ex. B.  According to Plaintiff's Witness Statement Form, Rodak "said he didn't see me behind him when asked.  I didn't report it at the time because I took his word."  *Id.*  Plaintiff later decided to report it, however, after Rodak made statements on October 30, 2008 that he does not like Black people, that he wished someone would kill President Obama, and that he would do

---

[2]  Although Plaintiff asserts that this event occurred in October 2009, *see* Doc. No. 63, Pl.'s CSF ¶ 4, the Witness Statement Form is clearly dated October 30, 2008, Doc. No. 54-8, Def.'s Ex. B, and Plaintiff was no longer on the ship as of October 2009.

it himself if he got the chance.  *Id.*  Plaintiff's Witness Statement asserts that this incident constitutes a "hostile work environment."  *Id.*

Plaintiff's Witness Statement was forwarded to Security Officer James Conway, who is responsible for performing investigations of criminal allegations, handling physical security, and responding to and investigating injuries.  Doc. No. 54-3, James Conway Decl. ¶¶ 4-5.  Conway investigated the incident by meeting with both Plaintiff and Rodak.  Plaintiff informed Conway that he believed the stabbing was racially motivated.  Doc. No. 54, Def.'s CSF ¶ 5. Plaintiff did not, however, indicate that he was injured by the knife.  Doc. No. 54-3, James Conway Decl. ¶ 7; *see also* Doc. No. 63-2, Pl.'s Decl. ¶ 6 (stating that his injury "was not serious and did not require medical attention").  In comparison, Rodak admitted that he did not like President Obama, yet denied making any racially offensive comments or stabbing Plaintiff.  Doc. No. 54-3, James Conway Decl. ¶ 8.

Because there were no witnesses or surveillance footage of the incident, Conway concluded that he could not verify Plaintiff's claim and then reported his findings to the human resources department.  *Id.* ¶¶ 9-10.  After this incident, Plaintiff had no more problems with Rodak.  Doc. No. 54, Def.'s CSF ¶ 5.

### 3.    Plaintiff's Application for Second Sanitation Steward Ready List

On November 4, 2008, Plaintiff applied for the Second Sanitation Steward Ready List, *id.* ¶ 6, which was his fourth time applying for this position. Doc. No. 63-2, Pl.'s Decl. ¶ 8.

As part of the application process, Shaughnessy interviewed Plaintiff on November 13, 2008.  *See* Doc. No. 54-4, Lynn Rolland Decl. ¶ 7.  Shaughnessy relayed to Rolland (the Human Resources Manager), that his interview with Plaintiff lasted nearly an hour, which was not typical.  *Id.* ¶ 9.  Shaughnessy further relayed that Plaintiff was timid, nervous, and appeared uncomfortable, and that Shaughnessy had to ask for relevant management experience that Plaintiff was not volunteering on his own.  *Id.* ¶ 9.  Because Plaintiff did not demonstrate the confidence or assertiveness that was required for the position, Shaughnessy decided not to recommend Plaintiff for the position.[3]  *Id.* ¶ 10.

Plaintiff asserts that "Norman," a Filipino male, was placed on the Second Sanitation Steward Ready List even though Plaintiff was more qualified. Doc. No. 63-2, Pl.'s Decl. ¶ 8.  On the same day Shaughnessy interviewed and

---

[3]  Neither party provides any explanation as to whether placement on the Second Steward Sanitation Ready List is itself a promotion, or merely identifies the pool of individuals that may be promoted a Second Steward Sanitation position.  Defendant does not dispute, however, that the failure to place Plaintiff on this list was an adverse action.  The court therefore refers to this action interchangeably as a failure to promote and/or failure to place on this list.

made his decision as to Plaintiff, however, he also interviewed Bobby Jackson, who is African American, and recommended him for the Second Sanitation Steward Ready List.  *See* Doc. No. 54-4, Rolland Decl. ¶¶ 11-15.  On November 26, 2008, Shaughnessy interviewed Juliann Fallen, who is also African American, and recommended her for the Second Sanitation Steward Ready List as well.  *Id.* ¶¶ 17-21.

On December 16, 2008, Plaintiff filed a discrimination charge with the EEOC.  Doc. No. 54, Def.'s CSF ¶ 9; Doc. No. 63-4, Pl.'s Ex. 2.[4]  On January 12, 2009, Plaintiff filed a Complaint for discrimination with the Hawaii Civil Rights Commission ("HCRC").  Doc. No. 63-5, Pl.'s Ex. 3.

### 4.  *Plaintiff's Psychological Consultations*

In early 2009, Defendant referred Plaintiff to a privately-practicing psychiatrist, Dr. Fiona Leigh, M.D., for a psychological examination.  Dr. Leigh subsequently consulted with Plaintiff on March 2, 9, 16, and 30, 2009, and April 6, 13, and 20, 2009.  Doc. No. 66, Leigh Decl. ¶¶ 1-3.

Each of these meetings was requested by the ship's physician through a "Shoreside Referral from Ship's Physician to Shoreside Physician," which

---

[4]  Although Defendant originally objected to Plaintiff's exhibits as "irrelevant, incompetent, hearsay and unauthenticated," Defendant withdrew these objections to all exhibits except Plaintiff's Exhibit 5.  With leave of court, Plaintiff thereafter provided appropriate authentication for Plaintiff's Exhibit 5.

included a section for Dr. Leigh to fill out for each visit explaining, among other things, her treatment, diagnosis, and need for followup. *See* Doc. No. 66 at Ex. 1. For each visit, Dr. Leigh filled out this form and provided it to Plaintiff, who then provided it to Defendant. Doc. No. 74-1, Leigh Decl. ¶ 7. Through these forms, Dr. Leigh diagnosed Plaintiff as follows:

- major depression single episode DSM IV 296-33. Medication not indicated. Reactive to workplace mistreatment. *Id.* at ECF 6 of 13 (March 2, 2009).

- Reactive depression DSM IV 296-33 -- reactive to unfair/threatening work environment. *Id.* at ECF 7 of 13 (March 9, 2009).

- Reactive depression DSM IV 296-33. No sign of paranoia. Concerned about lack of enforcement of policies on ship. *Id.* at ECF 8 of 13 (March 16, 2009).

- DSM IV 296-33 Major depression reactive to unfair treatment and lack of response to complaint in his employment. Medication not indicated. *Id.* at ECF 9 of 13 (March 30, 2009).

- Reactive depressive disorder. DSM 296-33. No sign of psychosis. No paranoia. No longer apprehensive. No nightmares since counseled. *Id.* at ECF 10 of 13 (Apr. 6, 2009).

- Depressive disorder reactive to difficult ship environment. DSM IV 296-33. Mood improved. Mental status WNH. No psychosis. No paranoia or nightmares. *Id.* at ECF 11 of 13 (April 13, 2009).

- Reactive depression DSM IV 296-33 reactive to reportedly discriminative work environment and apparent attempts to cover up NCL inaction on his behalf. *Id.* at ECF 12 of 13 (April 20, 2009).

Defendant subsequently terminated its relationship with Dr. Leigh,

and the ship's physician, Dr. Barton Hershfield, reviewed Dr. Leigh's referral form notes to determine whether Plaintiff was psychiatrically stable and could remain on the ship without additional psychiatric appointments.  Doc. No. 73-1, Hershfield Suppl. Decl. ¶¶ 7-8.  The only information Dr. Hershfield received from Dr. Leigh were these forms, and he did not communicate her diagnoses with anyone else on the ship except for fellow medical staff members who needed to know.  *Id.* ¶ 12.

### 5.    *The June 13, 2009 Chemical Burn Incident*

On the evening of June 13, 2009, Plaintiff prepared to clean cooking grills by putting on his coveralls and personal protective gear (including gloves, apron, boots, and goggles).  Doc. No. 54-7, Def.'s Ex. A at 58-59, 66.  At his deposition, Plaintiff explained that the protective gear is necessary because the chemicals used to clean the grill will "burn like crazy" and "eat you up, your skin." *Id.*  Plaintiff proceeded to clean a grill by pouring chemicals on it, burning off the debris, and then scrubbing it.  *Id.* at 59-60.  After cleaning parts of the grill, Plaintiff took off his personal protective gear and went to "lunch."[5]  *Id.* at 63-64. After his break, Plaintiff  put back on his protective gear and continued scrubbing the grill.  *Id.*

As Plaintiff sweat while scrubbing the grill, he began feeling a

---

[5]  Although Plaintiff referred to going to "lunch," Plaintiff was performing these duties at night.  *See* Doc. No. 54-7, Def.'s Ex. 7 at 63.

burning sensation on his back.  *Id.* at 61, 65-66.  When the burn became "overbearing," Plaintiff took off his personal protective gear and co-workers confirmed that his back was "bad" (*i.e.*, had burns on it) and that he should leave. *Id.* at 67-68.  Plaintiff therefore clocked out and went to his room to take a shower. *Id.* at 68-69.  In disrobing for his shower, portions of his skin came off in three areas attached to his coverall and/or apron.  *Id.* at 69.

While Plaintiff waited for the ship's medical clinic to open in the morning to have his burns treated, he called the Federal Bureau of Investigations ("FBI") to report that "somebody did something to, you know, sabotage my, you know, apron."  *Id.* at 69-70.  Plaintiff relayed to the FBI that this "sabotage" may be related to his discrimination complaints:

> Q.     Okay.  Tell me what you remember about your conversation with the FBI lady.
> A.     I told her since I filed the discrimination charge I've been harassed and everything else, and a lot of stuff has been happening.  I've been confronted.  I've been harassed.  I've been like assaulted and so forth.  So I said this is getting really dangerous.
> So, you know, this has gotten out of control.  I said I've been stabbed.  I've been confronted.  I've been called the "N" word.  I mean, you know, I've been -- people talk about, yeah, you filed this and that.
> So it was all kinds of stuff going on.  I was ignoring a lot of the stuff, but I said until that happened, then I said, oh, this has gone too far.

*Id.* at 72.[6]  In response, the operator at the FBI told Plaintiff to call the Maui Police Department.  *Id.* at 77.

After his call to the FBI, Plaintiff went to the clinic where he was treated by Dr. Hershfield.  *Id.* at 78.  Plaintiff told Dr. Hershfield that somebody had put chemicals on his clothing, and according to Plaintiff, Dr. Hershfield "tried to brush it off like [Plaintiff's] crazy or something" and gave Plaintiff a slip to go back to work.  *Id.* at 78-79.  According to Dr. Hershfield, it was apparent at this time that Plaintiff did not feel safe aboard the ship.  Doc. No. 54-6, Hershfield Decl. ¶ 6.

After being treated at the clinic, Plaintiff called the Maui Police Department ("MPD"), which sent out officers and a Hazmat truck to the ship.  Doc. No. 54-7, Def.'s Ex. A at 76.  Plaintiff told the MPD officers that he believed someone placed chemicals on his coveralls in retaliation for Plaintiff reporting discrimination.  *See* Doc. No. 63-6, Def.'s Ex. 4.  The Hazmat team collected and tested Plaintiff's coveralls, and confirmed that the coveralls contained a caustic substance that caused Plaintiff's burns.  Doc. No. 63-2, Pl.'s Decl. ¶ 15.

---

[6]  In response to specific questions during his deposition, Plaintiff also testified that he told the FBI that somebody was trying to kill him.  Doc. No. 54-7, Def.'s Ex. A at 75.  In his Declaration, however, Plaintiff denies that he told the FBI or the Maui Police Department ("MPD") that somebody was trying to kill him.  *See* Doc. No. 63-2, Pl.'s Decl. ¶ 14.  Whether Plaintiff told authorities that someone was trying to kill him as opposed to merely cause him harm does not affect the court's analysis.

After the Hazmat team and the MPD left, Plaintiff was told to report back to the medical clinic to fill out an accident form. *Id.* ¶ 16.  After Plaintiff refused to fill out the form on the basis that his burns were intentional and not "accidental," he renamed the form an "incident report" and filled it out. *Id.*; Doc. No. 54-6, Hershfield Decl. ¶ 8.[7]  Dr. Hershfield found that Plaintiff's reaction to his injury was "bizarre and over the top."  Doc. No. 54-6, Hershfield Decl. ¶ 9.  Dr. Hershfield further believed that Plaintiff was suffering from paranoia, which was escalating and creating a potential danger to Plaintiff and others. *Id.* ¶ 9.  Dr. Hershfield therefore consulted with Medical Manager Jan Kolb, RN, and concluded that Plaintiff should be removed from the ship because he feared for his safety and that his behavior could escalate to dangerous levels. *Id.* ¶ 10.  In the Crew Disembarkation/Medical Notification form, Dr. Hershfield listed Plaintiff's diagnosis/condition as "paranoid ideation/stable," and described the reason for disembarkation as:

> Crew member alleges that someone put a chemical in his uniform which caused burns of his back and buttocks. He refused to fill out an Accident Form, saying this was no accident, and instead called the FBI to investigate.  He has complained of a work environment which he has described to a psychiatrist as unfair, threatening and discriminatory.  He does not appear to be an immediate threat to himself or others, but obviously does not feel

---

[7] Neither party provided the "incident report" as an exhibit.

safe on the ship.

Doc. No. 54-17, Def.'s Ex. K.  In his Declaration, Dr. Hershfield explains that "[w]hen I treated Mr. Mizraim, he told me that an unidentified person put chemicals in his uniform and it caused the burns on his back."  Doc. No. 54-6, Hershfield Decl. ¶ 6.  That is, Plaintiff "never said that he thought the burns were related to his race or in retaliation to his previous conduct aboard the ship."  *Id.* ¶ 7.

Plaintiff was escorted off the ship that same day.  Doc. No. 63-2, Pl.'s Decl. ¶ 17.

### 6.    *Events After the June 13, 2009 Incident*

Approximately five days after disembarking, Plaintiff contacted Stehli Krause, the Crew Claims Manager, who was responsible for coordinating Plaintiff's follow-up medical care and potential recall to work.  Doc. No. 54-5, Stehli Krause Decl. ¶ 3; Doc. No. 54-7, Def.'s Ex. A at 134.  Apparently because Plaintiff needed to see a dermatologist before he could begin working on the ship again, both Plaintiff and Krause attempted to schedule Plaintiff an appointment. Doc. No. 54-7, Def.'s Ex. A at 134-35.

In the meantime, Plaintiff traveled to Syracuse, New York to stay with a friend.  Doc. No. 63-2, Pl.'s Decl. ¶ 18.  On July 10, 2009, Plaintiff consulted

with Dr. Suraiya Aziz, M.D. regarding his burns, *id.* ¶ 18, and Dr. Aziz referred

him to a dermatologist.  Doc. No. 54-7, Def.'s Ex. A at 136.

On July 21, 2009, Plaintiff notified Krause that he could not obtain an

appointment with a dermatologist in the Syracuse area, and that he would be

traveling to the Philippines in August 2009 for six weeks.  Doc. No. 54-5, Krause

Decl. ¶ 4.  Krause therefore attempted to locate a dermatologist for Plaintiff before

he left on his trip, but was unable to do so.  *Id.* ¶ 5.  Krause also attempted to

schedule a dermatologist appointment for Plaintiff in the Philippines, but Plaintiff

did not respond to email.  *Id.* ¶ 6.

On October 21, 2009, Plaintiff was back in Syracuse where he

consulted with Dr. Derek Cooney, who reported that there was no dermatological

reason to limit Plaintiff's work.  Doc. No. 63-2, Pl.'s Decl. ¶ 19.  In November

2009, Plaintiff traveled to the Philippines again for three weeks.  *Id.* ¶ 20.

In a December 16, 2009 letter, Krause followed up with Plaintiff

regarding their attempts to schedule a dermatologist appointment.  Krause outlined

their communications and efforts, and explained that Dr. Cooney's opinion is

insufficient to clear him for work:

> Dr. Cooney is not a dermatologist, nor did he offer any
> opinion as to the cause of your back lesions.  (Identifying
> the cause of your lesions is important to confirm your
> claim that an unknown person is endangering your life by

14

> putting chemicals in your uniform.  Such determination
> would then help NCLA ascertain the suitability of your
> return to work on the ship.)

Doc. No. 19, Def.'s Ex. M.  Krause reiterated that Defendant would like to

schedule a dermatologist appointment for Plaintiff at Defendant's expense, that

Plaintiff remains employed with Defendant, and that this appointment is necessary

for Plaintiff's treatment and for Defendant to process his return to the ship.  *Id.*

On December 17, 2009, Plaintiff responded via email, stating that he

did not understand the correspondence because he was no longer an employee.

Doc. No. 54-20, Def.'s Ex. N.  Although Krause told Plaintiff that he was still an

employee via email, phone, and letter, Plaintiff insisted that he no longer works for

Defendant.  Doc. No. 54-5, Krause Decl. ¶¶ 11-13.  According to Plaintiff, he

believes that he was constructively terminated when he was disembarked on June

14, 2009.  Doc. No. 63-2, Pl.'s Decl. ¶ 21.

In a final December 28, 2009 letter, Krause reaffirmed that Defendant

had not terminated Plaintiff and asked whether Plaintiff was declining work and

additional medical treatment.  Doc. No. 54-21, Def.'s Ex. O.  Plaintiff did not

respond.  Doc. No. 54, Def.'s CSF ¶ 23.

//

//

**B.     Procedural Background**

On November 18, 2010, Plaintiff filed this action in the First Circuit Court of the State of Hawaii, asserting claims for (1) employment discrimination in violation of Title VII and HRS § 378-2 (Count I); (2) hostile work environment in violation of Title VII and HRS § 378-2 (Count II); (3) IIED (Count III); (4) retaliation in violation of Title VII and HRS § 378-2 (Count IV); and (5) violation of the HWPA (Count V).  On January 31, 2011, Defendant removed the action to this court.

On August 13, 2012, Defendant filed its Motion for Summary Judgment.  Plaintiff filed an Opposition on October 24, 2012, and Defendant filed its Reply on October 30, 2012.  A hearing was held on November 9, 2012. Defendant provided the Declaration of Fiona J. Leigh, MD on November 19, 2012, and the parties submitted supplemental briefing on December 10, 2012.

### III.  <u>STANDARD  OF REVIEW</u>

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Rule 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial."

16

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004). "When the moving party has carried its burden under Rule 56[(a)] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at

248).  When considering the evidence on a motion for summary judgment, the

court must draw all reasonable inferences on behalf of the nonmoving party.

*Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille*

*Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence

of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn

in his favor" (citations omitted)).

## IV.  <u>DISCUSSION</u>

Defendant argues that summary judgment should be granted on each

of Plaintiff's claims.  The court addresses each of Plaintiff's claims in turn.

## A.     Title VII

Plaintiff asserts that Defendant violated Title VII by discriminating

against him on the basis of race (Count I), creating a hostile work environment

(Count II), and retaliating against him for reporting unlawful conduct (Count IV).

Based on the following, the court finds that Plaintiff has failed to establish a

genuine issue of material fact in support of any of these claims.

### 1.     *Discrimination*

Plaintiff asserts that Defendant discriminated against him on the basis

of race when it (1) reduced his hours; (2) failed to promote him to the Second

Steward Ready List; (3) constructively terminated Plaintiff by disembarking him;

and (4) refused to re-embark Plaintiff aboard the ship.  The court first outlines the relevant framework and then addresses each of these assertions.

      *a.    McDonnell Douglas Framework*

      *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), provides a "useful tool [ ] at the summary judgment stage" in addressing Title VII claims.  *See McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004).  Under this framework, Plaintiff has the initial burden to establish a *prima facie* case of discrimination.  *EEOC v. Boeing Co.*, 577 F.3d 1044, 1049 (9th Cir. 2009) (citation and quotation omitted).  A *prima facie* case under *McDonnell Douglas* requires Plaintiff to offer proof that: (1) he belongs to a protected class; (2) he performed his job adequately or satisfactorily; (3) he suffered an adverse employment action such as termination, demotion, etc.; and (4) other similarly situated employees who do not belong to the same protected class were treated differently.[8]  *McDonnell Douglas*, 411 U.S. at 802; *see Cornwell v. Electra Cent.*

---

[8] Despite this "useful tool" of the *McDonnell Douglas* framework, there is nothing that "compels the parties to invoke the *McDonnell Douglas* presumption." *McGinest*, 360 F.3d at 1122. "When responding to a summary judgment motion . . . [the plaintiff] may proceed by using the *McDonnell Douglas* framework, or alternatively, may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated [the employer]." *Metoyer v. Chassman*, 504 F.3d 919, 931 (9th Cir. 2007) (quoting *McGinest*, 360 F.3d at 1122). If the plaintiff submits direct or circumstantial evidence, "a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial." *Id.* (quoting *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998)). Although Plaintiff's counsel asserted at the hearing that the *McDonnell Douglas* framework may

(continued...)

*Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006); *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1168 (9th Cir. 2007).

"The requisite degree of proof necessary to establish a *prima facie* case for Title VII . . . on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1148 (9th Cir. 1997) (citation omitted). If Plaintiff puts forth his *prima facie* claim, the burden then shifts to Defendant to put forward a legitimate, non-discriminatory reason for its actions. If Defendant proffers such a reason, the burden shifts back to Plaintiff to show that Defendant's reason is actually a pretext for discrimination. *Boeing Co.*, 577 F.3d at 1049 (citation and quotation omitted).

"[A] plaintiff's burden is much less at the prima facie stage than at the pretext stage." *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1158 (9th Cir. 2010). That is, circumstantial evidence of pretext must be specific and substantial, *see Becerril v. Pima Cnty. Assessor's Office*, 587 F.3d 1162, 1163 (9th Cir. 2009), and a plaintiff must do more than merely deny the credibility of the defendant's proffered reason. *See Schuler v. Chronicle Broad. Co.*, 793 F.2d 1010, 1011 (9th

---

[8](...continued)
not apply in this action, counsel was unable to point to any direct or circumstantial evidence demonstrating that discrimination more than likely motivated Defendant in taking any adverse actions against Plaintiff. The court therefore applies the *McDonnell Douglas* framework.

20

Cir. 1986).  "A plaintiff can show pretext directly, by showing that discrimination [or retaliation] more likely motivated the employer, or indirectly, by showing that the employer's explanation is unworthy of credence." *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2004); *see also Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1094-95 (9th Cir. 2005).  "Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory [or retaliatory] statements or actions by the employer." *Coghlan*, 349 F.3d at 1095.  Circumstantial evidence requires an additional inferential step to demonstrate discrimination. *Id.*

   *b. Application -- reduction of hours*

   For Plaintiff's prima facie case that Defendant reduced Plaintiff's hours based on race, there is no dispute that he belongs to a protected class, he performed his job adequately, and he suffered an adverse employment action when his hours were reduced.  Thus, at issue is whether Plaintiff has established a genuine issue of material fact that non-African American, similarly situated employees did not experience similar hours reductions.

   In support of this element, the only evidence Plaintiff puts forward are his own statements that Filipino workers "received more work hours, better work assignments, and were not disciplined as severely as Black employees, including me," Doc. No. 63-2, Pl.'s Decl. ¶ 3, that he "looked at the time sheets," and that he

and other African American employees were sent home while Filipino workers were asked to stay longer.  *See* Doc. No. 54-7, Def.'s Ex. A. at 166.  These bare, conclusory allegations are insufficient to establish that Defendant in fact gave Filipino workers more hours than Plaintiff and are therefore insufficient to carry Plaintiff's summary judgment burden of establishing a prima facie case of discrimination on the basis of race.  *See Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005) (holding that "conclusory statements of bias do not carry the nonmoving party's burden in opposition to a motion for summary judgment"); *Lucas v. Chicago Transit Auth.,* 367 F.3d 714, 726 (7th Cir. 2004) (holding "that conclusory statements [regarding similarly situated employees], not grounded in specific facts, are not sufficient to avoid summary judgment"); *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993) ("When the nonmoving party relies only on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact."); *Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409, 1419 (9th Cir. 1988) ("[P]urely conclusory allegations of alleged discrimination, with no concrete, relevant particulars, will not bar summary judgment."); *see also Soremekun*, 509 F.3d at 984 ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.");

*Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 345 (9th Cir. 1995) (stating that conclusory or speculative testimony is insufficient to raise a genuine issue of fact to defeat summary judgment).

On its face, Plaintiff's assertion that Filipino workers were allowed to stay at work longer is purely anecdotal and does not establish that they in fact received more hours -- Plaintiff offers no explanation describing when and how often Filipino workers were given more hours (one day, a week, a month, a year?), whether there were times when Plaintiff received more overtime than other workers, or even whether these Filipino workers were in the same position as Plaintiff and therefore similarly situated. And to the extent that Plaintiff *suspects* that Filipino workers were given more overtime, Plaintiff could have substantiated his suspicions by presenting time sheets, records, or other pay information. Instead, the only evidence showing actual hours worked by employees was submitted by Defendant, which establishes that for the month of September 2008, Defendant worked the most hours out of any galley steward. *See* Doc. No. 54-2, Ronald Strode Decl. ¶¶ 8-9, Doc. No. 54-13, Def.'s Ex. G; *see also* Doc. No. 54, Def.'s CSF ¶ 3. On this record, no reasonable jury could find that Defendant reduced Plaintiff's hours more than those of similarly situated non-African American employees. *See Swinnie v. Geren*, 379 Fed. Appx. 665 (9th Cir. 2010)

23

(holding that the plaintiff failed to establish a prima facie case "because the record shows that several similarly situated individuals outside of his protected class received fewer hours than Swinnie, while one African American co-worker was at or near the top in hours during the relevant pay period").

The court further finds that even if Plaintiff could establish a prima facie case, Defendant has presented a nondiscriminatory reason for the reduction in hours -- Strode was instructed to reduce the number of overtime hours and did so by reducing every crewmember's hours by a similar amount.  Doc. No. 54-2, Strode Decl. ¶¶ 6-7.  In response, Plaintiff offers no evidence (much less specific and substantial evidence) suggesting that this reason was pretext.  Rather, the only specific evidence of hours worked by employees suggests that Plaintiff's hours were reduced the least compared to other galley stewards.

The court therefore GRANTS Defendant's Motion for Summary Judgment on Plaintiff's Title VII discrimination claim to the extent based on the assertion that Plaintiff's hours were reduced.

        c.      *Application -- failure to promote*

Like Plaintiff's claim based on the reduction of overtime, there is no dispute that Plaintiff can establish the first three elements of his prima facie case. Rather, at issue is whether Plaintiff has established that other non-African

24

American, similarly-situated employees were promoted instead of him.  The only

evidence Plaintiff presents in support of this element is his assertion that

"Norman," a Filipino male, was placed on the Second Sanitation Steward Ready

List even though Plaintiff was more qualified.  Doc. No. 63-2, Pl.'s Decl. ¶ 8.  As

explained above, however, Plaintiff's self-serving, conclusory assertions are

insufficient to establish a genuine issue of material fact that Defendant promoted

non-African American, similarly situated employees instead of Plaintiff.  Indeed,

Plaintiff fails to even address whether he and "Norman" are similarly situated.

And even if Plaintiff could establish a prima facie case, Defendant

provides a non-discriminatory reason for failing to promote Plaintiff -- that during

his interview, Plaintiff appeared timid and nervous, and therefore failed to

demonstrate the confidence and assertiveness that was required for the position.

*See* Doc. No. 54-4, Lynn Rolland Decl. ¶ 10.  Further supporting that Shaughnessy

made his promotion decision based on merit and not race is that Shaughnessy

promoted other African American employees to the Second Galley Ready List,

including one promotion made on the same day that Defendant chose not to

promote Plaintiff.  *Id.* ¶¶ 11-15, 17-21.  *See also Nelson v. Quality Food Centers,*

*Inc.*, 2009 WL 36854, at *5 (W.D. Wash. Jan. 6, 2009) (finding that evidence that

defendant hired and promoted other African-American employees established a

25

"strong inference" of lack of racial bias).  This evidence certainly supports that Shaughnessy made his decision without regard to race, and Plaintiff has come forward with no specific and substantial evidence suggesting that Defendant's decisions on promotions were pretext.

In opposition, Plaintiff argues (in wholly confusing and conclusory fashion) that his demeanor during his interview was due to the fact that he had reported the stabbing incident only two weeks prior to the interview, and Shaughnessy might have promoted the other African American employees in response to Plaintiff's reporting.  *See* Doc. No. 64, Pl.'s Opp'n at 6-7.  This argument strains credulity.  The reasons for Plaintiff's demeanor at his interview do not undermine the undisputed fact that Plaintiff failed to exhibit the confidence that Shaughnessy was looking for in successful candidates.  Further, Plaintiff's rife speculation regarding Shaughnessy's motives in promoting two other African American employees does not carry his burden of presenting substantial and specific evidence of pretext.

The court therefore GRANTS Defendant's Motion to Dismiss Plaintiff's Title VII discrimination claim to the extent based on a failure to promote.

### d.   *Application -- disembarkation*

As to Plaintiff's prima facie case that Defendant discriminated against Plaintiff when he was disembarked, there is no dispute that he was disembarked, and that this disembarkation was an adverse action.[9]  The parties dispute,  however, whether Plaintiff has established that non-African American, similarly situated individuals were treated differently in disembarkation decisions.

In support of this element, Plaintiff fails to present any evidence regarding similarly-situated employees who were disembarked.  *See* Doc. No. 64, Pl.'s Opp'n at 7-10; *see also Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1157 (9th Cir. 2010) (explaining that "individuals are similarly situated when they have similar jobs and display similar conduct") (quoting *Vasquez*, 349 F.3d at 641 (determining that employees who did not engage in problematic conduct of comparable seriousness were not similarly situated).  On this basis alone, Plaintiff has failed to establish a genuine issue of material fact in support of his prima facie

---

[9]  Plaintiff also argue that this disembarkation was a constructive discharge.  The court rejects this argument out of hand -- Plaintiff presents no evidence (again, other than his own conclusory assertion) that his disembarkation was a termination, and as discussed above, such self-serving conclusory statements are not enough to create a genuine issue of material fact on summary judgment.  Further, the evidence regarding Plaintiff's disembarkation establishes that he was not terminated -- as Plaintiff recognized in his own deposition, Plaintiff needed medical consultation before coming back to the ship, and he worked with Krause for several months to schedule a dermatologist appointment.  *See* Doc. No. 54-7, Def.'s Ex. A at 134-35.  And in her correspondence to Plaintiff, Krause repeatedly told Plaintiff that Defendant still considered him an employee.  Doc. No. 54-5, Krause Decl. ¶¶ 4-13, Doc Nos. 54-19 -20, -21, Def.'s Exs. M-O.  In short, the evidence conclusively demonstrates that Plaintiff was not constructively discharged.

case.

Further, even if Plaintiff could establish a prima facie case, Defendant has established a non-discriminatory reason for disembarking Plaintiff -- Dr. Hershfield determined that Plaintiff did not feel safe on the ship and that he should be disembarked for the safety of both himself and others aboard.  Dr. Hershfield based this determination on his initial treatment of Plaintiff's burns, his knowledge that Plaintiff called the FBI, and Plaintiff's insistence that someone had intentionally harmed him.  *See* Doc. No. 54-17, Def.'s Ex. K.  Although Dr. Hershfield believed that Plaintiff did not appear to be an immediate threat to himself or others, he concluded that Plaintiff "obviously does not feel safe on the ship" and therefore should be disembarked.  *Id.*

In opposition, Plaintiff argues that Dr. Hershfield's reasons for disembarking Plaintiff are pretext because his statements regarding Plaintiff's condition have changed over time.  *See* Doc. No. 64, Pl.'s Opp'n at 12-13. Specifically, Plaintiff asserts that the disembarkation decision must be pretext because Dr. Hershfield initially stated that he did not believe that Plaintiff was an "immediate threat to himself or others," Doc. No. 54-17, Def.'s Ex. K, but now states in his Declaration that Plaintiff was "potential danger to him and others." Doc. No. 54-6, Hershfield Decl. ¶ 9.  Contrary to Plaintiff's argument, there is no

28

inconsistency in Dr. Hershfield's statements.  As explained in both the

disembarkation form and his Declaration, Dr. Hershfield had diagnosed Plaintiff as

paranoid.  As he explained in the disembarkation form, Dr. Hershfield found that

Plaintiff "does not appear to be an immediate threat to himself or others, but

obviously does not feel safe on the ship."  Doc. No. 54-17, Def.'s Ex. K.  This

statement is fully consistent with his later statement in his Declaration that "I

believed Mr. Mizraim felt unsafe aboard the ship and was suffering paranoia.  His

reaction to his paranoia was escalating and it created a potential danger to him and

others.  I thought that if his reactions continued to escalate, he might lash out at

crewmembers in what he believed to be self defense."  Doc. No. 54-6, Hershfield

Decl. ¶ 9.  In other words, Dr. Hershfield believed that although Plaintiff was not

an immediate threat, his paranoia could increase and create an unsafe situation for

Plaintiff and others if he remained aboard the ship.

Plaintiff further argues that the disembarkation decision was pretext

because Dr. Hershfield is not a certified psychiatrist, the psychiatrist Plaintiff

previously saw from March through April 2009 never found that he was paranoid,

and Defendant could have sought corroboration for Dr. Hershfield's evaluation.

*See* Doc. No. 64, Pl.'s Opp'n at 12-15.  These arguments simply do not hold water.

That Dr. Hershfield is not a certified psychiatrist does not undermine his

29

determination -- Dr. Hershfield is certified in emergency medicine and serves as the ship's physician.  Doc. No. 54-6, Hershfield Decl. ¶¶ 2-3.  Further, whether a psychiatrist found that Plaintiff was not paranoid several months before the June 13, 2009 incident sheds no light on whether he was paranoid on June 13, 2009. And to the extent Plaintiff asserts that Defendant should have sought a second opinion, Plaintiff has presented no evidence that Defendant's normal practice was to obtain a second opinion and/or even that a second opinion was possible (much less prudent) under these circumstances.

The court therefore GRANTS Defendant's Motion to Dismiss Plaintiff's Title VII discrimination claim to the extent based on Plaintiff's disembarkation and/or alleged constructive discharge.

### e.    *Failure to re-embark Plaintiff*

As to Plaintiff's prima facie case that Defendant discriminated against Plaintiff by failing to re-embark him, Plaintiff has again failed to present any evidence that non-African American, similarly situated individuals were treated differently in re-embarkation decisions.  Indeed, Plaintiff does not address this element whatsoever in his Opposition.

The court therefore GRANTS Defendant's Motion for Summary Judgment on Plaintiff's Title VII discrimination claim to the extent based on

Defendant's failure to re-embark Plaintiff.

### 2. Hostile Work Environment

A hostile work environment claim requires a plaintiff to show that: (1) he was subjected to verbal or physical conduct of a racial nature; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the employee's conditions of employment and create an abusive work environment. *Vasquez*, 349 F.3d at 642; *Galdamez v. Potter*, 415 F.3d 1015, 1023 (9th Cir. 2005). In considering whether the discriminatory conduct was "severe or pervasive," the court looks to "all the circumstances, including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1110 (9th Cir. 2000) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998)). The court must consider the totality of the circumstances, including whether the harassment was both objectively and subjectively abusive. *Freitag v. Ayers*, 468 F.3d 528, 539 (9th Cir. 2006). Further, where the alleged harasser is a co-worker rather than a supervisor, a plaintiff must show that "the employer knew or should have known of the harassment but did not take adequate steps to address it." *Swinton v. Potomac Corp.*, 270 F.3d 794, 803 (9th Cir. 2001).

31

Plaintiff has not established a genuine issue of material fact that he was exposed to verbal or physical conduct of a racial nature that was sufficiently severe or pervasive to alter Plaintiff's conditions of employment.  As described above, Plaintiff has failed to establish a genuine issue of material fact that his reduction in hours, lack of promotion, or disembarkation was due to his race.  And the only other incidents that Plaintiff complains about are (1) the October 30, 2008 incident where his co-worker Rodak used racial epithets, leading Plaintiff to believe that Rodak had stabbed him several days earlier due to his race; and (2) the June 13, 2009 incident where Plaintiff was burned, leading him to believe that someone was trying to harm him.  Neither of these incidents supports a hostile work environment claim.

The October 30, 2008 incident was between Plaintiff and a co-worker and there is no evidence (and Plaintiff does not even suggest) that Defendant did not take proper steps in response to Plaintiff's complaint.  Conway investigated Plaintiff's complaint that Rodak stabbed him, and ultimately concluded that he could not determine what happened because Rodak denied Plaintiff's assertions, there was no corroborating evidence, and Plaintiff was not injured from the alleged stabbing.  Doc. No. 54-3, Conway Decl. ¶¶ 5-9.  And after this investigation, Plaintiff had no more problems with Rodak.  Doc. No. 54, Def.'s CSF ¶ 5.  Given

this investigation -- which Plaintiff does not question -- Plaintiff has failed to establish that any racially motivated actions by Rodak can be imputed upon Defendant and form the basis of a hostile work environment claim.  *See Swinton*, 270 F.3d at 803.

As to the June 13, 2009 incident, there is no evidence whatsoever that someone intentionally placed chemicals on Plaintiff's clothing, much less that such person took such action due to Plaintiff's race.  Rather, Plaintiff offers only his own speculation that his burns were intentional and in retaliation for him making discrimination claims, yet Plaintiff himself cannot even speculate as to who allegedly placed the chemicals on his clothing.  With no evidence that Plaintiff was in fact intentionally burned due to his race, Plaintiff has failed to establish that the June 13, 2009 incident is part of any nucleus of facts supporting a hostile work environment claim.

In sum, neither of these isolated incidents supports that Defendant created a hostile work environment due to Plaintiff's race.  And even if these incidents could somehow be imputed upon Defendant (as opposed to stray events possibly caused by co-workers), these events, although severe, are isolated and therefore would not alter the conditions of Plaintiff's employment.

The court therefore GRANTS Defendant's Motion for Summary

Judgment on Plaintiff's Title VII hostile work environment claim.

### 3. *Retaliation*

Plaintiff asserts that he suffered retaliation for engaging in protected activity when he was denied a promotion to the Second Sanitation Steward Ready List, and when he was disembarked and/or was not re-embarked. The court first outlines the relevant framework, and then addresses Plaintiff's claims.

#### a. *Retaliation framework*

An employer may not discriminate against an employee because the employee has opposed an employment practice made unlawful by Title VII. 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice [prohibited by Title VII] . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."); *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) ("Title VII's anti-retaliation provision forbids employer actions that discriminate against an employee . . . because he has opposed a practice that Title VII forbids or has made a charge, testified, assisted, or participated in a Title VII investigation, proceeding, or hearing." (citations and quotation signals omitted)).

To make a *prima facie* showing of retaliation, the plaintiff must show

that (1) he opposed an employment practice made unlawful by Title VII; (2) the

defendant took an adverse action against him; and (3) there was a causal link

between his involvement in his opposition and the adverse action taken by the

defendant.  *Freitag*, 468 F.3d at 541; *McGinest*, 360 F.3d at 1124.

      To oppose a practice within the meaning of Title VII, an employee

must "resist or antagonize," "contend against," "confront," or "withstand" the

conduct.  *Crawford v. Metro. Gov't of Nashville & Davidson*, 555 U.S. 271, 276,

(2009).  For example, "'[w]hen an employee communicates to her employer a

belief that the employer has engaged in . . . a form of employment discrimination,

that communication' virtually always 'constitutes the employee's *opposition* to the

activity.'"  *Id.* (citing 2 EEOC Compliance Manual §§ 8-II-B(1), (2), p. 614:0003

(Mar. 2003) (other citations omitted)).  "It is unnecessary that the employment

practice actually be unlawful; opposition thereto is protected when it is 'based on a

"*reasonable belief*" that the employer has engaged in an unlawful employment

practice.'"  *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 969 (9th Cir.

2002) (citing *Moyo v. Gomez,* 40 F.3d 982, 984 (9th Cir. 1994)).  The EEOC

Compliance Manual explains:

> A complaint about an employment practice constitutes
> protected opposition only if the individual explicitly or
> implicitly communicates a belief that the practice
> constitutes unlawful employment discrimination.

Because individuals often may not know the specific requirements of the anti-discrimination laws enforced by the EEOC, they may make broad or ambiguous complaints of unfair treatment. Such a protest is protected opposition if the complaint would reasonably have been interpreted as opposition to employment discrimination.

2 EEOC Compliance Manual § 8-II-B(2), p. 6508 (Mar. 2003) (footnotes omitted); *see also Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 399 (2008) (explaining that EEOC compliance manuals "reflect 'a body of experience and informed judgment to which courts and litigants may properly resort for guidance'").

"To show the requisite causal link, the plaintiff must present evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982). "The causal link can be inferred from circumstantial evidence such as the employer's knowledge of the protected activities and the proximity in time between the protected activity and adverse action." *Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9th Cir. 2011) (citing *Jordan v. Clark*, 847 F.2d 1368, 1376 (9th Cir. 1988)); *see also Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 507 (9th Cir. 2000) ("[W]hen adverse employment decisions are taken within a reasonable period of time after complaints of discrimination have been made, retaliatory intent may be inferred.").

36

The *McDonnell Douglas* burden-shifting framework applies to Plaintiff's retaliation claim. *See McGinest*, 360 F.3d at 1124. Thus, if Plaintiff establishes a prima facie case of retaliation, the burden shifts to Defendant to offer a legitimate, non-discriminatory explanation for the challenged action. *Dawson*, 630 F.3d at 936. "If the employer provides a legitimate explanation for the challenged decision, the plaintiff must show that the defendant's explanation is merely a pretext for impermissible discrimination." *Id.* (citing *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000)). To survive summary judgment, Plaintiff must offer either direct evidence of discriminatory motive, or specific and substantial circumstantial evidence. *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1066 (9th Cir. 2003).

> b.     *Application -- failure to promote*

Although the facts regarding causation are tenuous, Plaintiff can arguably establish a prima facie case that Defendant failed to promote him in retaliation for engaging in protected activity.

First, Plaintiff engaged in protected activity: (1) in September 2008 when he complained to Strode that he and other African American workers were getting their hours reduced while Filipino and Caucasian workers were receiving more hours, Doc. No. 63-2, Pl.'s Decl. ¶ 4; (2) in October 2008 when Plaintiff and

a co-worker submitted a joint written statement to Rolland regarding the allegedly

discriminatory reduction in hours, Doc. No. 63-2, Pl.'s Decl. ¶ 5; and (3) on

October 30, 2008 when Plaintiff reported that Rodak may have stabbed Plaintiff

because of his race.  Doc. No. 54-8, Def.'s Ex. B.

Second, on November 13, 2008, Plaintiff suffered an adverse action

when Shaughnessy recommended that Plaintiff not be placed on the Second

Sanitation Steward Ready List.

Third, viewing the facts in a light most favorable to Plaintiff, the

proximity in time between Plaintiff's complaints and Shaughnessy's decision

arguably creates a genuine issue of material fact as to causation -- Shaughnessy

made his decision only weeks after Plaintiff made his various complaints, and

although requiring an inferential leap, a fact-finder could potentially find that

Shaughnessey knew of this protected activity given that he is Strode's supervisor

and he interacted with the human resources department in determining who to

promote.  *See Dawson*, 630 F.3d at 936 ("The causal link can be inferred from

circumstantial evidence such as the employer's knowledge of the protected

activities and the proximity in time between the protected activity and adverse

action."  (citing *Jordan*, 847 F.2d at 1376); *Hernandez v. Spacelabs Med. Inc.*, 343

F.3d 1107, 1113 (9th Cir. 2003) ("Hernandez provided sufficient evidence from

which a reasonable jury could infer both that Pray either knew or suspected that Hernandez had reported the alleged harassment to Lasher, and that there was a causal connection between this knowledge or suspicion and Hernandez's termination."); *see also Blanchard v. Lahood,* 461 Fed. Appx. 542, 544 (9th Cir. 2011) ("[I]t is causation, and not temporal proximity alone, which is an element of a plaintiff's retaliation claim.") (citing *Porter v. California Dep't of Corr.*, 419 F.3d 885, 894-95 (9th Cir. 2005)); *Cohen v. Fred Meyer, Inc.,* 686 F.2d 793, 796 (9th Cir. 1982) ("Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity.").

But Defendant has come forward with a legitimate reason for deciding not to place Plaintiff on the Second Sanitation Steward Ready List -- as described above, Plaintiff does not deny that during his interview he was nervous and timid and failed to display the confidence necessary for the Second Galley Ready list. Plaintiff therefore has the burden to establish, through direct or circumstantial evidence that is specific and substantial, that this reason is mere pretext. Plaintiff has failed to do so.

The only evidence that Plaintiff relies on to establish pretext is the proximity between his protected activity and his application for promotion. *See* Doc. No. 64, Pl.'s Opp'n at 6 ("Defendant submits that the reason Plaintiff did not

39

get the position was because he was "timid and nervous" (See Def.'s CSOF ¶ 7;

Ex. C).  At the time of Plaintiff's interview he had just filed an internal complaint

with Defendant about a hostile work environment.").  Although the causation and

pretext inquiry can often overlap such that evidence establishing a prima facie case

also establishes pretext, *see Emeldi v. Univ. of Or.*, 698 F.3d 715, 729 (9th Cir.

2012), the court finds that Plaintiff's evidence of proximity in this action is

insufficient to create a genuine issue of material fact of retaliatory motive in failing

to promote Plaintiff.

As a starting place, a plaintiff's ability to establish a prima facie case

does not by itself preclude summary judgment if an employer presents a legitimate

non-retaliatory reason and the plaintiff cannot establish pretext.  *See, e.g.*, *Nilsson*

*v. City of Mesa*, 503 F.3d 947, 954  (9th Cir. 2007) (holding that plaintiff failed to

establish a genuine issue of material fact as to pretext even though she had

established her prima facie case based on her employer's knowledge of her EEOC

complaint); *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1465 (9th Cir. 1994)

(determining that although low marks on an employee evaluation satisfied prima

facie case, they were insufficient to establish pretext).

And although *Dawson* provides that "[i]n *some* cases, temporal

proximity *can* by itself constitute sufficient circumstantial evidence of retaliation

for purposes of both the prima facie case and the showing of pretext," 630 F.3d at 937 (emphasis added), Plaintiff does not cite, and this court cannot find, any Ninth Circuit case actually determining that proximity *alone* necessarily establishes pretext.  Indeed, cases suggesting that proximity can establish pretext generally rely on additional facts to support the inference of retaliation.  *See, e.g.*, *Emeldi*, 698 F.3d at 729 (holding that plaintiff established a genuine issue of pretext due to the proximity between the protected activity and the adverse action, combined with numerous other factors supporting the inference of retaliation); *Dawson*, 630 F.3d at 937 (determining that a genuine issue of material fact existed where "the protected activity occurred at most two days before the discharge and the treatment of Dawson was a topic during both the protected activity and the discharge"); *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 970 (9th Cir. 2002) ("Little has tendered sufficient evidence, in addition to the proximity of events, to rebut this alleged reason."); *see also Bell v. Clackamas Cnty.*, 341 F.3d 858, 866 (9th Cir. 2003) ("Here, the temporal proximity between Bell's complaints and the alleged adverse employment actions, together with evidence of Alderman's and Cadotte's contemporaneous displeasure with Bell's complaints of May 18 regarding racial comments and racial profiling, provides strong circumstantial evidence of retaliation."); *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276,

1287 n.10 (9th Cir. 2001) ("The evidence of timing of the events in this case and the evidence of Taylor's hostility toward Winarto could support a jury's reasonable inference that Taylor had a retaliatory motive.").

Thus, although proximity may be sufficient to meet a plaintiff's "minimal" burden on his prima facie case, *see Cordova*, 124 F.3d at 1148, numerous district courts have found that evidence of proximity, standing alone, is not the "specific and substantial evidence" necessary to carry a plaintiff's burden of establishing a genuine issue of material fact as to pretext. *See, e.g.*, *Villareal v. Chubb & Son, Inc.*, 2012 WL 3151254, at *10 (C.D. Cal. July 31, 2012) (explaining that "temporal proximity, *together* with the *other* evidence, may be sufficient to establish pretext" (quotations omitted)); *Huck v. Kone Inc.*, 2011 WL 6294466, at *9 (N.D. Cal. Dec. 15, 2011) ("[T]emporal proximity alone [however] is not sufficient to raise a triable issue as to pretext once the employer has offered evidence of a legitimate, nondiscriminatory reason for the termination."); *Read v. LaHood*, 2010 WL 4236931, at *6 (W.D. Wash. Oct. 20, 2010) ("So while Plaintiff may arguably have presented a *prima facie* case for retaliation, temporal proximity alone does not suffice as evidence of pretext in the face of Defendants' non-retaliatory reasons for the hire (*Dilettoso v. Potter*, 243 Fed. Appx. 269, 2007 WL 2051415 (9th Cir. 2007)), and Plaintiff presents no other evidence that even

suggests a retaliatory motive behind this action.").

And so it is clear that context matters.  Although the Ninth Circuit has directed that "in some cases" proximity "can" establish pretext, the analysis turns on the specific facts presented and few cases (if any) have actually found that such evidence by itself creates a genuine issue of material fact of pretext.  Applying this principle and viewing the evidence in a light most favorable to Plaintiff, the only potential evidence of pretext is the proximity in time between Plaintiff's protected activity and the adverse action, along with the speculative inference that Shaughnessy knew of Plaintiff's complaints.  This evidence, on its own, does not suggest a retaliatory motive when viewed under the circumstances of Plaintiff's request for promotion.  Specifically, Plaintiff does not dispute that he was timid and nervous at the interview, or that confidence was a necessary quality for the promotion.  *See also* Doc. No. 54-16, Def.'s Ex. J (describing that a Second Sanitation Steward "needs to provide efficient leadership for a team comprised of 50 Galley Utilities and Galley Stewards").  In other words, it is undisputed that Plaintiff did not display the qualities necessary for promotion to the Second Galley Ready list and that Defendant denied Plaintiff the promotion on this basis -- that is, the denial of promotion was merit-based.  Plaintiff offers no reason to question this explanation.  In short, the proximity between Plaintiff's protected activities and

Defendant's decision not to promote Plaintiff standing alone does not suggest a retaliatory motive under the totality of the circumstances.

The court therefore GRANTS Defendant's Motion for Summary Judgment as to Plaintiff's Title VII retaliation claim based on a failure to promote.

c.     *Application -- disembarkation and failure to re-embark*

Plaintiff also asserts that his disembarkation and failure to be re-embarked was in retaliation for his reporting discrimination and hostile work environment claims to his superiors, Defendant's human resources department, the EEOC, the HCRC, the FBI, and the MPD.  In support of this claim, Plaintiff's counsel argued at the November 9, 2012 hearing that Dr. Hershfield's disembarkation form is proof of his knowledge of Plaintiff's protected activity. The disembarkation form explains the following facts as supporting Dr. Hershfield's determination that Plaintiff was suffering from paranoia:

> Crew member alleges that someone put a chemical in his uniform which caused burns of his back and buttocks. He refused to fill out an Accident Form, saying this was no accident, and instead called the FBI to investigate.  He has complained of a work environment which he has described to a psychiatrist as unfair, threatening and discriminatory.  He does not appear to be an immediate threat to himself or others, but obviously does not feel safe on the ship.

Doc. No. 54-17, Def.'s Ex. K.

44

Viewed in a light most favorable to Plaintiff, the evidence presented establishes that Dr. Hershfield was aware that (1) Plaintiff had reported to the FBI that someone had intentionally placed chemicals on his uniform; (2) the ship had referred Plaintiff to a psychiatrist for a psychiatric evaluation, where Plaintiff reported that his workplace was discriminatory; (3) Plaintiff had asserted in his psychiatric evaluations that he was discriminated against (based on the forms that Plaintiff provided to Defendant after each session); and (4) Plaintiff is African-American. Thus, there are two bases for Plaintiff's retaliation claim -- that he was retaliated against for (1) reporting the incident to the FBI; and (2) reporting to Dr. Leigh that his workplace was discriminatory.

As to the first retaliation claim, Plaintiff did report violations of Title VII to the FBI. *See* Doc. No. 54-7, Def.'s Ex. A at 70-72. Yet there is no evidence suggesting that Dr. Hershfield knew that Plaintiff complained that someone placed chemicals on his uniform *in retaliation for his filing discrimination complaints*. In other words, Dr. Hershfield's knowledge of Plaintiff's generic complaint to the FBI that he was intentionally burned does not establish knowledge that Plaintiff had complained of any perceived violations of Title VII. *See Freitag*, 468 F.3d at 541-42 (holding that the opposition clause of 42 U.S.C. § 2000e-3(a) requires a showing that the employer knew plaintiff was involved in a protected activity);

45

*Noga v. Costco Wholesale Corp.*, 583 F. Supp. 2d 1245, 1262 (D. Or. 2008) ("[A] general complaint about a coworker does not amount to a complaint about discrimination."); *Miller v. Winco Holdings, Inc.*, 2006 WL 1471263, at *8 (D. Idaho May 22, 2006) ("Miller must have notified her supervisors, however, that her opposition to the employer's practices was based on grounds of discrimination and not merely a personality conflict or a professional dispute.").  The court therefore finds that Dr. Hershfield's knowledge that Plaintiff had made complaints to the FBI that someone had burned him does not establish that Dr. Hershfield knew that Plaintiff had engaged in protected activity.

Dr. Hershfield's knowledge of Plaintiff's communications with Dr. Leigh, however, presents a different -- and difficult -- question.  Plaintiff met with Dr. Leigh pursuant to Defendant's orders, and during his sessions he complained of a discriminatory work environment.  In turn, Dr. Leigh wrote in her diagnoses that Plaintiff felt he was discriminated against, and had Plaintiff return the forms to Defendant.  *See* Doc. No. 74-1, Leigh Suppl. Decl. ¶ 7.  Viewed in a light most favorable to Plaintiff, Plaintiff's actions of (1) complaining about discrimination to a psychiatrist that Defendant required him to go see, and then (2) returning to Defendant his diagnosis stating that he complained of discrimination, is purposeful enough to suggest that Plaintiff engaged in protected activity.  *See Crawford*, 555

46

U.S. at 276 (explaining that an employee must "resist or antagonize," "contend against," "confront," or "withstand" the conduct).   And although Defendant asserts that Dr. Hershfield did not know that Plaintiff was claiming *racial* discrimination, such fact can reasonably be inferred given that Plaintiff is African-American -- there is simply no other explanation as to why Plaintiff asserts he was discriminated against.

A genuine issue of material fact also exists as to whether Plaintiff's protected activity of complaining of a discriminatory work environment  was the reason for his disembarkation and failure to be re-embarked.  Dr. Hershfield reviewed Dr. Leigh's notes in the referral forms sometime after Plaintiff's last meeting with Dr. Leigh on April 20, 2009.  *See* Doc. No. 73-1, Hershfield Suppl. Decl. ¶ 8.  As a result, Dr. Hershfield was aware of Plaintiff's complaints of a "discriminatory" work environment in making his disembarkation decision, and even cited these complaints in support of his disembarkation decision.  This timing between Plaintiff's protected activity and disembarkation/failure to be re-embarked, combined with Dr. Hershfield's knowledge of Plaintiff's complaints, is sufficient to create a genuine issue of material fact as to causality.[10]  *See, e.g.,*

_____

[10]   The Ninth Circuit has recognized that the causation and pretext inquiries are often overlapping.  *See Emeldi v. Univ. of Or.*, 698 F.3d 715, 729 (9th Cir. 2012) (rehearing en banc denied) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 286 (3d Cir. 2000)), *see also Stegall v. Citadel Broad. Co.,* 350 F.3d 1061, 1069-70 (9th Cir. 2003) (holding that a nine-day

(continued...)

*Stegall*, 350 F.3d at 1069.

 The court therefore DENIES Defendant's Motion for Summary Judgment on Plaintiff's Title VII retaliation claim based on his disembarkation and failure to be re-embarked.

## B. HRS 378-2

 Like Title VII, HRS § 378-2 makes it an unlawful discriminatory practice for any employer (1) "to discriminate against any individual in compensation or in the terms, conditions, or privileges of employment" because of race, HRS § 378-2(a)(1)(A), or (2) "to discharge, expel, or otherwise discriminate against any individual because the individual has opposed any practice forbidden by this part." HRS § 378-2(a)(2). The court applies the Title VII burden-shifting framework to Plaintiff's discrimination and retaliation claims under HRS § 378-2. *See Schefke v. Reliable Collection Agency, Ltd.*, 96 Haw. 408, 426, 32 P.3d 52, 70 (2001); *Sam Teague, Ltd. v. Haw. Civil Rights Comm'n*, 89 Haw. 269, 279 n.10, 971 P.2d 1104, 1114 n.10 (1999).

 As to Plaintiff's state law hostile work environment claim, Hawaii

---

[10](...continued)
lapse between the employee's protected activity and her termination, in addition to other evidence supporting employee's retaliation claim, was sufficient to establish a triable issue of fact as to whether the employer's explanations for her termination were pretextual). Further, Defendant argued only that Plaintiff has failed to establish his prima facie case. *See* Doc. No. 53-2, Def.'s Mot. at 24-25.

courts have generally addressed sexual harassment hostile work environment claims, *see, e.g.*, *Nelson v. Univ. of Haw.*, 97 Haw. 376, 387, 38 P.3d 95, 106 (2001), and the Hawaii Supreme Court has not yet addressed a hostile work environment claim based on racial harassment. *See Chenoweth v. Maui Chem. & Paper Products, Inc.*, 2007 WL 3254858, at *3 (D. Haw. Nov. 5, 2007) ("The Court is unaware of any Hawaii state court cases that have specifically determined whether racial harassment may support a hostile work environment claim under state law, similar to federal law.").  But in addressing hostile work environment claims based on sexual harassment, the Hawaii Supreme Court has relied on the Title VII framework (except for some nuanced differences not applicable here), and the court sees no reason why the Hawaii Supreme Court would not rely on such framework for a hostile work environment claim based on racial harassment. *See, e.g.*, *Arquero v. Hilton Haw. Village LLC*, 104 Haw. 423, 431, 91 P.3d 505, 513 (2004) (describing distinctions between federal and Hawaii law).

        As a result, for all the same reasons explained above as to Plaintiff's Title VII claims, Plaintiff's state-law claims for discrimination, hostile work environment, and retaliation all fail as well, except for Plaintiff's retaliation claims based on disembarkation and failure to re-embark.  *See, e.g.*, *Turner v. Dep't of Educ. Hawaii*, 855 F. Supp. 2d 1155, 1179 (D. Haw. 2012) (summarily dismissing

§ 378-2 claims for same reasons as Title VII claims).  The court therefore

GRANTS in part and DENIES in part Defendant's Motion for Summary Judgment

on Plaintiffs state law claims, with Plaintiff's state law claims for retaliation based

on disembarkation and failure to re-embark remaining.

## C.    HWPA

The HWPA makes it unlawful for an employer to retaliate against a

employee-whistleblower.  Specifically, the HWPA provides:

> An employer shall not discharge, threaten, or otherwise
> discriminate against an employee regarding the
> employee's compensation, terms, conditions, location, or
> privileges of employment because:
>> (1) The employee, or a person acting on behalf of
>> the employee, reports or is about to report to the
>> employer, or reports or is about to report to a
>> public body, verbally or in writing, a violation or a
>> suspected violation of:
>>> (A) A law, rule, ordinance, or regulation,
>>> adopted pursuant to law of this State, a
>>> political subdivision of this State, or the
>>> United States . . . .

HRS § 378-62.  A plaintiff must therefore establish that: (1) he engaged in conduct

protected by the HWPA; (2) the employer took some adverse action against him;

and (3) a causal connection exists between the alleged retaliation and the protected

conduct.  *See Griffin v. JTSI, Inc.*, 654 F. Supp. 2d 1122, 1130 (D. Haw. 2008)

(citing *Crosby v. State Dep't of Budget & Fin.*, 76 Haw. 332, 342, 876 P.2d 1300,

1310 (1994)).

Compared to Title VII, an HWPA claim is not subject to the same

burden shifting on summary judgment:

> The HWPA's legislative history indicates that the legislature intended that the required burden of proof [in showing a causal connection] be similar to that utilized in traditional labor management relations discharge cases." [*Crosby*, 76 Haw. at 342, 876 P.2d at 1310.]  In labor management retaliation cases under the National Labor Relations Act, 29 U.S.C. §§ 151-169, the employer bears "'the burden of negating causation'" once the employee makes an initial showing of a causal connection.  *Id.* (quoting *Sonicraft, Inc. v. N.L.R.B.*, 905 F.2d 146, 150 (7th Cir. 1990); *see also* Hse. Stand. Com. Rep. No. 25, in 1987 House Journal, at 1090 (noting the "existing custom and practice of placing the burden of proof on the employer in [labor management] discharge cases").
>
> Thus, the causal connection requirement under the HWPA has two stages of proving or negating the causation between the protected conduct and the employee's termination.  First, the employee must make a prima facie showing "that his or her protected conduct was a 'substantial or motivating factor' in the decision to terminate the employee." *Crosby*, 76 Haw. at 342, 876 P.2d at 1310; *accord Nabors Alaska Drilling, Inc. v. N.L.R.B.*, 190 F.3d 1008, 1015 (9th Cir. 1999).  Second, once the employee makes its prima facie showing, the employer must then "'defend affirmatively by showing that the termination would have occurred regardless of the protected activity.'" *Crosby*, 76 Haw. at 342, 876 P.2d at 1310 (quoting *N.L.R.B. v. Howard Elec. Co.*, 873 F.2d 1287, 1290 (9th Cir. 1989)); *see also N.L.R.B. v. Searle Auto Glass, Inc.*, 762 F.2d 769, 773 (9th Cir. 1985) ("[A]s an affirmative defense, the employer may show by a preponderance of the evidence that the

51

employee would have been terminated even in the absence of the protected conduct."); *Nabors Alaska Drilling*, 190 F.3d at 1015 (holding that once the employee makes its prima facie showing, "[t]he burden then shifts to the employer to prove that legitimate reasons supported the termination").

*Id.* at 1131-32 (footnote omitted).  Thus, a plaintiff can survive summary judgment on an HWPA claim by establishing a genuine issue of material fact on his prima facie case.  *See Mussak v. Hawaii*, 126 Haw. 25, 265 P.3d 494 (Haw. App. Dec. 7, 2011) (unpublished) (explaining that under *Crosby*, "[t]o defeat the employer's summary judgment motion, the employee must bring forward some evidence of each element of his or her HWPA claim."); *see also Griffin*, 654 F. Supp. 2d at 1134 ("Defendant JTSI's alleged indifference toward Plaintiffs' complaints raises a question of material fact as to the causal connection element and supports an inference that Defendant JTSI may have also been motivated by a desire to silence the Plaintiffs."); *Timpe v. WATG Holdings Inc.*, 2008 WL 2355611, at *9 (D. Haw. June 10, 2008) (denying a motion for summary judgment on an HWPA claim because in "[d]rawing all reasonable inferences in favor of Plaintiff, the close temporal proximity between the report and Plaintiff's termination, combined with the short duration of Plaintiff's employment and surrounding circumstances -- a reasonable trier of fact could conclude that Plaintiff's report was a substantial or motivating factor for her termination") (internal citation omitted).

In its Motion, Defendant assumes that Plaintiff engaged in protected activity when he reported that he was burned by chemicals, and that the adverse action was his disembarkation.  Defendant then proceeds to argue in summary fashion that Plaintiff cannot establish causality because "he does not present evidence sufficient to raise the inference that his reporting being burned by chemicals was the likely reason for the adverse action."  Doc. No. 53-2, Def.'s Mot. at 27.  Assuming that Plaintiff's reporting of his chemical burns constitutes protected activity, the court rejects this argument.  At the time that Dr. Hershfield disembarked Plaintiff for paranoia, Dr. Hershfield was aware that Plaintiff had reported to the FBI that someone had intentionally placed chemicals on his uniform.  Indeed, Dr. Hershfield cited this reporting as one of the facts supporting that Plaintiff was suffering from paranoia.  *See* Doc. No. 54-17, Def.'s Ex. K.  Dr. Hershfield's knowledge, combined with the proximity in time between Plaintiff's reporting and the disembarkation, creates a genuine issue of material fact that this reporting was a motivating factor in Dr. Hershfield's decision.  And although Defendant argues that it had a legitimate reason for disembarking Plaintiff, the court disagrees that no genuine issue of material fact exists -- Dr. Hershfield initially cleared Plaintiff to go back to work, and then only after the MPD and Hazmat team performed an investigation did Dr. Hershfield determine that Plaintiff

should be disembarked.  This timeline raises an inference that Plaintiff's

disembarkation was a direct result of making complaints.[11]

      The court therefore DENIES Defendant's Motion for Summary

Judgment as to Plaintiff's HWPA claim.

## D.    IIED

      An IIED claim requires a plaintiff to establish that: (1) the act that

caused the harm was intentional or reckless; (2) the act was outrageous; and

(3) the act caused extreme emotional distress to another.  *Young v. Allstate Ins.*

*Co.*, 119 Haw. 403, 429, 198 P.3d 666, 692 (2008).  An IIED claim "requires

conduct exceeding all bounds usually tolerated by decent society and which is of a

nature especially calculated to cause, and does cause, mental distress of a very

serious kind."  *Hac v. Univ. of Haw.*, 102 Haw. 92, 106, 73 P.3d 46, 60 (2003)

(citing *Tibke v. McDougall*, 479 N.W.2d 898, 907 (S.D. 1992)).  An outrageous act

is one such that upon hearing the facts of a case "average members of our

community might indeed exclaim, 'Outrageous.'"  *See Young*, 119 Haw. at 429-30,

198 P.3d at 692-93.

---

    [11]  Unlike Title VII which protects from retaliation an employee who opposes a practice made unlawful by Title VII, the HWPA more broadly protects from retaliation an employee who reports a violation of "[a] law, rule, ordinance, or regulation . . . ."  HRS § 378-62.  Thus, although Plaintiff was unable to raise a genuine issue of material fact that his disembarkation was a result of his complaints of Title VII's opposition clause, his report to the FBI and the MPD regarding an on-board assault is sufficient to establish an issue of fact for his HWPA claim.

Defendant argues that Plaintiff's IIED claim fails because the only basis for this claim is the chemical burn incident and there is no evidence that Defendant (as opposed to a co-worker) placed chemicals on his uniform.  Doc. No. 53-2, Def.'s Mot. at 30-31.  The court disagrees -- as described above, Plaintiff has raised a genuine issue of material fact whether he was disembarked for reporting that a co-worker has placed chemicals on his uniform.  If true, these facts may be considered "outrageous" and support the IIED claim.

The court therefore DENIES Defendant's Motion for Summary Judgment on Plaintiff's IIED claim.

## V. <u>CONCLUSION</u>

Based on the above, the court GRANTS in part Defendants' Motion for Summary Judgment.  Plaintiff's claims for Title VII and state law retaliation based on disembarkation and/or failure to re-embark, HWPA, and IIED (limited to his disembarkation/failure to re-embark) remain.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, December 14, 2012.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Mizraim v. NCL America, Inc. et al.*, Civ. No. 11-00077 JMS/KSC, Order Granting in Part and Denying in Part Defendant NCL America LLC's Motion for Summary Judgment